### NORTHWESTERN JOBBERS CREDIT BUREAU v. NATIONAL SURETY CORPORATION.

No. 885.

District Court, D. Minnesota,
Fourth Division.

Feb. 29, 1944.

Charles F. Noonan (of Dorsey, Colman, Barker, Scott & Barber), of Minneapolis, Minn., for plaintiff.

Pierce Butler and R. O. Sullivan (of Doherty, Rumble, Butler, Sullivan & Mitchell), both of St. Paul, Minn., for defendant.

NORDBYE, District Judge.

Plaintiff seeks to recover from the defendant the sum of $4,525, which sum it is contended defendant is obligated to pay by reason of its obligation on a surety bond executed by it. The controlling facts may be set forth as follows: The plaintiff, for some years prior to November 5, 1937, was engaged in the management, operation and liquidation of businesses involved in financial difficulties. One C. D. Maclaren, Jr., hereinafter referred to as Maclaren, was the secretary, treasurer and manager of plaintiff, and usually was designated as trustee, assignee, or manager under trust deeds which might be executed in liquidation proceedings in which plaintiff was interested and controlled. On November 5, 1937, a corporation known as W. J. Dyer & Bro., Inc., made a written assignment for the benefit of its creditors to Maclaren and his successors, as managers of Northwestern Jobbers Credit Bureau. Maclaren acted as such trustee and also as manager of the plaintiff company until November 5, 1940, when he resigned as an officer and manager of the plaintiff company. As a part of the understanding and arrangement between plaintiff and Maclaren when the resignation took place, it was agreed that Maclaren should continue as trustee under the Dyer Trust, but as an individual, and not as an officer, agent, or employee of plaintiff. In addition, there were certain severance considerations between the parties, one of which pertained to an assignment to Maclaren of certain advances made by the plaintiff to the Dyer Trust. In permitting Maclaren to continue as trustee of the Dyer Trust, however, plaintiff required from him a bond in the sum of $15,000, running to itself and to the creditors and stockholders of the Dyer Company, conditioned upon the payment of all "costs, charges, expenses and losses" which plaintiff and the other obligees might suffer by reason of Maclaren's failure to perform his duties as trustee. The bond was to continue for a year from November 5, 1940, unless the trust was terminated prior to the expiration of that period. The defendant company furnished the bond in the form and the sum requested, and Maclaren then proceeded to handle the Dyer Trust as an individual.

Thereafter, and during the term of the bond, a number of lawsuits were commenced alleging various improper acts by Maclaren in his management of the trust during the period of the bond. Some of the suits were commenced against Maclaren and plaintiff jointly, and others were against Maclaren alone. On July 11, 1941, in the suits and proceedings brought against the plaintiff and Maclaren jointly, the defense as to plaintiff was tendered to the defendant surety. The defendant, however, refused to accept the defense and stated that it looked to the plaintiff and its attorneys to defend any such actions and proceedings. Of the three suits which were brought against Maclaren, and in which plaintiff was not joined, defendant received notice in a communication dated July 15, 1941.

These suits were predicated on the alleged wrongful acts and conduct of Maclaren as trustee during the term of the bond, and in the suits in which plaintiff was joined, the complainant therein sought to hold the plaintiff liable on the theory that the plaintiff company had accepted the trust and had placed Maclaren in as trustee and that, therefore, plaintiff was liable for the wrongful acts and breaches of duty on the part of Maclaren, notwithstanding that Maclaren had severed his connection with plaintiff prior to the happening of the claimed wrongful acts. In one suit by a stockholder of the Dyer Company, it was sought to charge plaintiff with liability on the theory that it was the legal trustee of the Dyer Trust and that Maclaren was the trustee de facto. In this suit, a prayer for the appointment of a receiver for the Dyer Company was made. In another suit by a creditor, a request for a receiver was made, and plaintiff was charged therein with being responsible for the malfeasance and wrongful stewardship of Maclaren as trustee since he retired as an official and manager of the plaintiff company. The showing indicates that the Dyer Company creditors contended, and apparently there were facts to substantiate this contention, that Maclaren had mismanaged and looted the trust to such an extent that there would be a net shortage of some $15,000. It may be noted that his mismanagement and wrongful acts consisted of personal overwithdrawals, excessive salary, improvident

718

expenditure of trust funds, and general mismanagement. Undoubtedly, these circumstances presented a situation which required the attention of some counsel representing plaintiff. The suits against the plaintiff had to be defended and all reasonable steps taken to protect it from being mulcted in damages in a substantial amount by reason of Maclaren's wrongdoing. When defendant refused to take over the defense of· the proceedings against plaintiff, the latter engaged its own attorneys, who were active in various proceedings arising in connection with the matters pending against Maclaren and the plaintiff, the petitions for the appointment of a receiver, and the final liquidation of the Dyer Company in bankruptcy. The petitions for a receiver of the Dyer Company in State Court were denied, but on August 20, 1941, the company was duly adjudicated a bankrupt. In the bankruptcy proceedings, the creditors claimed the right to surcharge Maclaren's account as trustee by reason of his wrongful and unlawful acts committed during the term of the bond, and then to proceed against the plaintiff on account of said deficiency.

The evidence indicates that plaintiff's attorneys were engaged in connection with ·the various lawsuits and other proceedings pertaining to the Dyer Trust from July 8, 1941, to September 10, 1942. Plaintiff's attorneys claim to have put in some 368¾ hours on matters and proceedings growing out of Maclaren's wrongful acts during the term of the bond. Plaintiff asserts that it was reasonably necessary that it should have the benefit of such legal services in order to protect and safeguard its interests by reason of the claims made against it growing out of Maclaren's wrongful acts. In the bankruptcy proceedings, an agreement was effected, which was approved by the court, whereby the creditors' claims against Maclaren by reason of. his wrongdoing were compromised and settled by the payment of $4,500. In that settlement, plaintiff contributed and paid $1,500. Maclaren, through the aid of certain relatives, paid $1,500, and the defendant paid $1,500. In addition the plaintiff also settled the claim of one George Mairs, a stockholder, for the sum of $25. Plaintiff contends that the reasonable value of the attorneys' fees incurred and paid on account of Maclaren's wrongful acts in handling the Dyer Trust during the term of the ·bond amounts to $3,000. This sum

together with the $1,500 paid to the Trustee in Bankruptcy and the $25 paid in settlement of the George Mairs claim, makes up the claim of $4,525, which is the amount sued for herein. The defense herein presents three issues in that the defendant company contends (1) that the bond was procured by misrepresenting and concealing material facts from the surety company; (2) that the payment of attorneys' fees is not covered by the bond; and (3) that the attorneys' fees paid by plaintiff and sought to be recovered herein do not represent the reasonable amount which was incurred as the proximate result of Maclaren's wrongful acts as trustee of the Dyer Trust during the term of his bond. These issues will be discussed in the order above stated.

*I. Was the bond procured by misrepresenting or concealing material facts?*

 The bond in question "is governed by the laws applicable to contracts of insurance." Thomas Co. v. National Surety Co., 1919, 142 Minn. 460, 172 N.W. 697, 698. Consequently, any misrepresentation or concealment made with the intent to deceive and defraud or any misrepresentation or concealment, regardless of the intent with which it was made, which increased the risk of loss, will avoid the bond and plaintiff can recover nothing. Mason's Minn.St.1927, § 3370; Minn.St. 1941, § 60.85; Thomas Co. v. National Surety Co., supra; - Johnson v. National Life Ins. Co., 1913, 123 Minn. 453, 144 N.W. 218, Ann.Cas.1915A, 458.

 Defendant contends that plaintiff failed to disclose to its agent who negotiated the bond certian facts which materially affected defendant's risk. It claims that when Mr. Green, defendant's agent, visited Maclaren's office regarding the issuance of the ·bond, Mr. Engstrom, plaintiff's vice-president, and Mr. Cooper, plaintiff's assistant manager, were also in Maclaren's office, and that no one disclosed to Green that Maclaren was no longer with the Bureau or that he was acting only in his individual capacity when negotiating for the bond. Defendant further contends that no one disclosed to Green that Maclaren was "decidedly in disfavor" with the Bureau's directors and that "the Bureau was investigating Maclaren's conduct of its affairs, particularly as they affected the Dyer Trust, and had found it

necessary to place a $500 limit" on any advances made by Maclaren from the Bureau's money unless the Adjustment Committee first approved. Finally, defendant argues that its agent was not informed that overdrafts in an amount of $4,964.99 against both Maclaren and the Dyer Trust were outstanding on the books of the Bureau.

But a consideration of these contentions in view of the evidence submitted at the trial seems to indicate that this defense completely falls down in light of the burden of proof which defendant must support. Mr. Green expressly testified that Engstrom told him in Maclaren's office that Maclaren was leaving the Bureau and that the Bureau was turning over to him the Dyer Trust and desired a bond from Maclaren, as principal, to indemnify it against any improper handling of the trust. On cross-examination by counsel for the plaintiff, he agreed that he knew Maclaren was going to take over the Dyer Trust personally. The correspondence between Green and Maclaren upon the issuance of the bond also establishes this fact. Consequently, defendant's claim that it was not informed that Maclaren was no longer employed by the Bureau or that he was acting in his individual capacity in negotiating the bond seems entirely unsupported by the evidence. Although Green testified that he did not know when Maclaren's association with the Bureau ceased, that fact does not seem material, if relevant here. The time of Maclaren's leaving had no effect upon defendant's risk, and that question is not raised by the evidence.

Defendant's contentions that Maclaren was in disfavor with the Bureau and that the Bureau was investigating Maclaren's conduct of its affairs, particularly with respect to the Dyer Trust, probably must be considered together, since the first contention seems to be deduced from the second one. Defendant refers to certain minutes of the Bureau's Board of Directors, and the excerpts therefrom which defendant relied upon at the trial have been submitted to the court from the reporter's notes. From the minutes of the meeting of plaintiff's Board of Directors on September 16, 1940, found on page 105 of the minute book, defendant quotes the following:

"The Secretary was advised that a motion has been made, seconded and carried, that Mr. Engstrom was to continue an investigation of the operations of the Bureau and submit his report to a special meeting of the Board, which would be called by President Ledbetter as soon as Mr. Engstrom could gather together his data."

This quotation gives no reason for the investigation. No cogent argument has been suggested why this court should presume that the investigation was started because the Board feared irregularities or mismanagement of any sort by Maclaren. It could have been started for many reasons unconnected with Maclaren. In fact, Mr. Ledbetter, president of the plaintiff, testified under cross-examination that Engstrom's investigation did not extend to the Dyer estate. Moreover, the fact, as shown by the minutes of the directors' meeting on June 6, 1940, which are found on page 96 of the minute book, that plaintiff limited to $500 the advances which Maclaren could make to the Dyer Trust (during his employment by plaintiff) seems of little importance. Such restriction was not an uncommon practice in the operation of plaintiff's business. It in no way reflects upon the Bureau's opinion or experience with Maclaren's honesty or ability.

Defendant argues that Maclaren had overdrafts in the amount of $4,964.99 when he resigned as manager of plaintiff company. But the minutes do not show, and there is no evidence which suggests, that the debt was that of Maclaren. The minutes of November 6, 1940, declare that the Bureau would " * * * execute the assignment of our claim to C. D. Maclaren of $4,964.99 *against the W. J. Dyer & Bros., Inc.,* which obligation represents advance made by the Bureau to the Dyer estate * * *." (Italics supplied).

The debt seems to have been against the Dyer estate and not Maclaren. Defendant cites nothing which shows that it was also Maclaren's debt. There seems little doubt that Maclaren under instructions from the plaintiff had authority to advance this money to the estate, for in the minutes of the Bureau's Board of Directors' meeting for May 26, 1940, it is recorded that the directors authorized the manager (Maclaren) to invest up to $5,000 in Dyer Brothers and to handle it as he saw fit. Neither is there any foundation for any inference that the assignment of this account to Maclaren reflects any irregularity. It apparently was one of the considerations

given Maclaren upon his leaving plaintiff's employ.

Consequently, there seems to have been no circumstances or details about the $4,964.99 which obligated plaintiff to inform defendant of its existence. It was a debtor-creditor transaction between the Dyer Trust and the plaintiff. There was nothing illegal or sinister connected with it, and defendant's deductions are unfounded. It seems clear from the evidence that plaintiff did not conceal from, or misrepresent to defendant anything which it was obligated to tell the defendant. Certainly, no such contention seems supported by a fair preponderance of the evidence.

## II. Was the payment of attorneys' fees covered by the bond?

 The bond in question provides that defendant will " * * * indemnify and save harmless said Northwestern Jobbers Credit Bureau * * * from all costs, charges, expenses, and losses occasioned by his (Maclaren's) failure to well and faithfully perform his duties as such trustee * * *."

A similar provision existed in Allen v. Eneroth, 1912, 118 Minn. 476, 482 137 N.W. 16, 19, and the court held:

"The bond covered all damages and losses sustained by Allen in consequence of the contractor's default. His default occasioned the lien suits in defending which Allen incurred this expense for the services of his attorney. We think the expense so incurred was properly charged under the bond."

The rule of that case was again recognized in First Church of Christ Scientist v. Lawrence, 1941, 210 Minn. 37, 297 N.W. 99. Consequently, Minnesota seems firmly committed to the rule that the expense, including attorneys' fees, incurred by an obligee in defending suits occasioned by the principal's failure to perform the duties covered by the bond, is recoverable from the surety who failed to defend the action after promising to save the obligee harmless from all expenses and losses resulting from the principal's failure to perform his duties. There seems no doubt that attorneys' fees were occasioned by Maclaren's failure to perform properly his duties as trustee. Consequently, these expenses and fees, to the extent they may be attributed to Maclaren's wrongdoing dur-

ing the term of the bond, seem properly chargeable against defendant.

## III. Were the attorneys' fees which plaintiff seeks to recover in this action reasonable in amount and were they incurred as the proximate result of Maclaren's wrongful acts during the term of the bond?

 We commence with the premise that Maclaren's wrongful acts as trustee during the term of the bond resulted in substantial loss to the Dyer Trust. Moreover, the fact that plaintiff incurred and paid its attorneys $3,000 for services claimed to have been performed in connection with the various lawsuits and proceedings instituted against it and others by the Dyer creditors and stockholders and for services rendered in the bankruptcy proceedings, including the compromise settlement with the bankruptcy trustee, is not controverted. Nor is there any satisfactory showing that such services were not reasonably worth $3,000. The question for the court to determine, however, is whether such services are expenses and losses resulting from Maclaren's failure to perform his duties as trustee during the term of the bond. In the retrospect, one may conclude that plaintiff may have been unduly alarmed about its liability to the creditors in the Dyer Trust by reason of Maclaren's misdoings, but it is apparent that the creditors not only contended that plaintiff was liable, but had commenced lawsuits against it to enforce such liability. Certainly, it seems clear that the lawsuits were instituted as the direct result of Maclaren's wrongful acts as trustee during the term of the bond. Plaintiff, in view of these claims and the apparent fact that Maclaren was some $15,000 short, could not sit idly by and permit judgments to be entered against it by default and serenely submit to the consequences which would follow such tactics. Certainly, attention had to be given not only to such litigation, but generally to all proceedings affecting Maclaren's liability to the Dyer Trust. The larger Maclaren's liability might prove to be, the greater potential liability there would be for the Bureau. It has not been demonstrated herein that the creditors' basis or theory for the liability of the Bureau as the legal trustee was groundless or without merit. Defendant does not contend that plaintiff did not engage attorneys in good faith in order to protect

its interests on account of Maclaren's misdoings. The bankruptcy of the Dyer Company likewise presented the question of the Bureau's potential liability to the extent which Maclaren's account as trustee might be surcharged. No one contends that, in the exercise of due prudence and good judgment, a settlement of Maclaren's liability to the bankruptcy trustee should not be effected if possible. In fact, everyone seems to recognize that the $4,500 settlement was a creditable accomplishment, and to which settlement plaintiff's attorneys made at least some contribution. Also, it was a favorable settlement of the defendant surety company's liability to the Trustee in Bankruptcy. It will be remembered that the creditors of the Dyer Company were obligees in the bond as well as the plaintiff.

It may be noted that Maclaren was apparently hopelessly insolvent. The creditors would be unable to obtain any redress from him. They looked to the financial responsibility of the Bureau or the defendant surety herein to replenish the losses caused by Maclaren. The question of the liability of the Bureau was novel and undoubtedly required an extended research of the law, and it is fair to assume that common prudence required close attention by plaintiff's counsel to all the proceedings in the lawsuits filed against Maclaren individually as well as to the bankruptcy proceedings so as to guard the plaintiff as effectively as possible from a substantial loss. If plaintiff had been required to make good the amount in which Maclaren's account as trustee had been surcharged, there can be no doubt but that the defendant would be liable to the plaintiff on its bond. It follows, therefore, that legal services rendered in behalf of plaintiff to minimize such liability are recoverable as against the surety, if in the exercise of reasonable diligence plaintiff's action in this regard was justified and warranted.

The time of plaintiff's counsel on all of these matters aggregates some 368 hours. The claim herein of $3,000 would indicate that the charge made by such attorneys was approximately $8 per hour. In view of the experience and ability of counsel, the questions involved, the novelty of the issues presented, and the results obtained, it would seem that the charges are reasonable. On the record herein, it would seem that the court is required to find that the attorneys' fees paid by plaintiff to its attorneys are not only reasonable but that they were incurred as the proximate result of Maclaren's wrongful conduct as trustee during the time of the bond. It is quite true that, where several attorneys are interested in any proceeding, each is tempted to claim the major share of the credit for the accomplishment of the result. But that plaintiff's counsel made a marked contribution to the results obtained is not seriously controverted. Certainly, their services had an important bearing on reducing to a very reasonable amount, in view of Maclaren's shortage, the ultimate recovery on the bond which defendant had given. To reduce the amount of attorneys' fees claimed, therefore, would be a rather peremptory gesture on the part of the court in light of the evidence.

There can be no meritorious objection to the $1,500 item which plaintiff paid as its share of the settlement with the bankruptcy trustee, and which it seeks to recover from the defendant herein. No convincing reason has been suggested why this item is not recoverable on the bond. The same observation may be made as to the $25 paid in settlement of the George Mairs claim.

It follows, therefore, that a recovery herein should be allowed the plaintiff as against the defendant in the sum of $4,525, with interest as claimed by the plaintiff in its amended complaint.

Findings of fact and conclusions of law consistent herewith may be presented by counsel for the plaintiff upon reasonable notice.

An exception is reserved to the defendant.